MONROE, C. J.
Plaintiff prosecutes this appeal from a judgment rejecting his demand. against defendants for $11,924.12, being a commission alleged to be due him as “the sole and only procuring cause” of the sale of about 6,000 acres of land which defendants owned in the parish of Rapides. He alleges that:
“About the 8th day of April in the year 1912, your petitioner, in his capacity as real estate agent, took up with John J. Rupp and his associates * * * the selling of their timber holdings in the parish of Rapides.”
That allegation is not sustained by a syllable in the transcript before us, containing nearly 300 pages and including the testimony of the plaintiff, whereby it is shown, affirmatively, conclusively, and without contradiction, that plaintiff proposed to buy defendant’s land for his own account, with a view o'f selling it for his own account at a profit for himself, and that he was never employed by defendants, as their agent, never dealt with them in that capacity, never pretended to be their agent, and never rendered them any service as such. Rupp and three associates, living in Michigan, owned the land in question, and were willing to sell it; and, as Rupp represented the others and the dealings were with him, we shall, for convenience, use only his name, in stating the case. Plaintiff lived in Alexandria, and was engaged in the real estate business. In February, 1912, he wrote to Rupp, offering to exchange *1024 320 acres of land, that he said that he owned, for a like quantity of that owned by Rupp. After some correspondence, he wrote on April 30th, two letters, asking Rupp to fix a price upon his entire holdings, as follows:
First letter: “I would like to know, by, say, the middle of next week, if you will make me •your lowest price and terms on your whole proposition. Should you see fit to make your price, I could pay, say, $30,000, cash, balance in 5 and 6 years, with interest,” etc.
Second letter, after stating that he had concluded not to wait for answer to the first:
“Therefore, taking the statement of Mr. Hoyt [defendant’s timber estimator], which was that you wanted $35 per acre for your 6,000 acres of pine, which is estimated to cut 10,500 feet per acre, or, will take $210,000 for your whole proposition, I will give you $210,000 for your entire holdings, provided the above estimate is correct, or can be verified, and, if you will wire me, immediately on receipt of this letter, accepting this offer,_ I will, at once, arrange a contract for us to sign, closing sale and giving me 30 or 60 days in which to estimate timber, examine title and close up trade, on terms mentioned in my letter of this date.”
Several other letters passed and one or two telegrams, but on April 24th Mr. Rupp wrote to plaintiff, referring to a previous letter of the 17th, in which he stated that he was negotiating with other people and adding:
“Therefore, we cannot enter into new negotiations at this time. * * * If, later, we should be in a position, and wish, to offer you these lands, our terms would be one-fourth cash, balance in 1, 2 and 3 years, six per cent., payable annually, no timber to be cut until paid for, and you would have to buy upon your own estimates as we would not be willing to enter into such a contract as you suggest.”
On April 25th, plaintiff, who had, of course, not received Rupp’s letter of the 24th, from which the foregoing excerpt is taken, wrote, saying, among other things:
"As explained, when I first wrote to you, I own some timber that joins yours, and, to mill mine, I could afford to buy yours if same could be had on a business basis, and mill it also with mine.”
The correspondence thus terminated, and was not renewed until June 8th, when plaintiff wrote:
“In April, I had some correspondence with you relative to the purchase of your 6,009 acres of .timbered land in this parish. You said, at that time, that there was another party considering the purchase of your entire holdings. If you have not sold, and your proposition is open, and you want to consider my offer, I will take the matter up with you.”
On June 12th, Rupp answered, stating his terms, and saying that, if plaintiff 'was ready to proceed with the examination of the land and would wire him to that effect:
“We would protect you for 10 days from that date. This tract is so close to Alexandria that ten days gives you ample time to look it over.”
On June 17th, plaintiff wrote, saying:
“Now, if you will give me 30 days to make examination of timber, if timber is what is claimed for it, and I meet with same success as before in securing right of way, I will take your holdings.”
On June 21st, Rupp wired that he would protect plaintiff for 30 days on terms mentioned in his letter of June 12th. On June 24th, plaintiff wired to Rupp.
“Make, .option on your timber holdings ’good up to August 1, and I will at once, commence examination.”
And on June 25th, the extension of time was granted by wire, and a letter was written on the same day, saying:
“My associates were reluctant about granting the extension, and I sincerely hope that you will proceed at once to make a careful examination of the timber and report as soon as your work is completed. I have applications from other parties and, for that reason, did not like to tie it up for so long. I expect to go to Washington parish shortly, and, from there, will go to Alexandria, * * * and, while there, hope to have a little visit with you.”
On July 17th, plaintiff wrote, in part, as follows:
“Your letters of June 12 and 25 at hand, granting option on your 5,962 acres of pine timbered land in this parish to me until August 1st. 1 have been delayed but am pushing things as fast as possible. I am figuring on paying all cash for your holdings, if same will interest you sufficient to reduce price, * * * what inducement will you offer me to pay all cash,” etc.
*1026 On July 26th the correspondence shows that the option was extended to August 10th. On July 27th, plaintiff wired:
“I am pushing estimate and if same shows timber there as expected, will you, on payment of $500, grant and protect me in option until August 25, 1912. Answer immediately.”
And Mr. Rupp answered on the same day:
“We have already agreed to protect you until August 10th, * * * if, on the 10th, you accept the purchase and everything is satisfactory we will then give you ten days to examine abstracts and close the trade.”
On August 7th, plaintiff wired:
“Have completed estimate and will take your holdings_at price named me, cash; I want until September first to examine title and arrange finance and dose deal. Wire answer.”
On August 8th, Mr. Rupp wired:
“Your telegram, seventh, received. Will be in New Orleans, St. Charles Hotel, Monday, the 12th. Meet me there. Answer.”
It appears from the evidence that plaintiff predicated his agreement to buy the land and proposition to pay all cash, etc., not upon his own means, but upon the. expectation of getting the money from others; that is to say, he did some negotiating with a Mr. Gin-grass and a Mr. Seiss, who were the owners of the Jessica Lumber Company, as a result of which a contract was entered into, whereby the Jessica Company was to buy, from him, for $270,000, the merchantable pine timber on the land that plaintiff was to buy from defendants, for $210,000, plaintiff reserving to himself the hardwood and the land. The contract was, however, not quite so advantageous to plaintiff as might appear from that statement, since it imposed upon him certain conditions which he found himself utterly unable to comply with; as, for instance, he bound himself to obtain rights of way for, and build, by January 1, 1913, and maintain until all the timber should be cut, not exceeding 10 years, a narrow gauge railroad, connecting the mill, to be erected by the Jessica Company, with the “Iron Mountain” Road, and to secure those, obligations, he was to give bonds for $35,000 and $5,000, respectively. He was also to give bond in the sum of $40,000 to secure his guaranty that the timber on the land would cut 60,000,000 feet of merchantable pine lumber, and he assumed other obligations which are expressed in specifications too numerous to mention. It was not within his contemplation or his means to build the railroad, but it appears that a certain lumber company had some such project in view, and plaintiff’s idea seems to have been to. arrange with it to take over his obligation in that respect, but he was unable to make the arrangement; unable to give the bonds required; unable, in other respects, to comply with his contract with the Jessica Company, and the contract lapsed. In the meanwhile, however (on August 12th), Mr. Rupp came to New Orleans, where he and plaintiff had an interview, concerning which plaintiff gives the following testimony:
“Q. In your conversation with Mr. Rupp, in the St. Charles Hotel, in New Orleans, did you disclose to him what you intended to do with this land? A. Yes, sir. Q. Did you state to Mr. Rupp that you expected to sell the land to Mr. Seiss and Mr. Gingrass? A. Yes, sir; one and the same thing. Q. Did you state to Mr. Rupp how you expected to be compensated? A. Yes, sir. Q. Did you state that you expected to sell the land, after you had bought it from him, at an advanced price? A. I did. Q. And that you expected to simply sell the pine timber and retain the hardwood and the land itself? A. I did ; the contract itself (referring to the contract with the Jessica Lumber Co. owned by Gin-grass and Seiss) will show. Q. You made that statement to Mir. Rupp. A. Yes, sir. Q. You also made the statement how you expected to pay for the land? A. Yes. Q. You were to pay for it yourself? A. When I met him at the St. Charles Hotel, I expected to pay for it in cash. Q. You told him you expected to purchase from him for $35 an acre, and pay for it yourself, and afterwards sell the timber to the lumber company? A. I told him I was going to sell Seiss & Gingrass the timber and retain the hardwood and land.”
Mr. Rupp went from New Orleans to Alexandria, and whilst he was in Alexandria, plaintiff, who was seeking a further extension *1028 of time, took Messrs. Seiss and Gingrass to' call on him, at the office of his (Mr. Rupp’s) attorney. Those gentlemen testify that the object of that call was to satisfy Mr. Rupp that plaintiff really had some one behind him. Mr. Seiss says in his testimony:
“In order to get the extension, he had to show Mr. Rupp that he had bona fide buyers, and that is why he insisted that Mr. Gingrass and I go to Mr. I-Iackenyos’ office, so that he could show Mr. Rupp that he had parties in position to buy. I do not remember what he discussed; am not sure now what he did. Mr. Rupp agreed to give him 10 days.”
Mr. Gingrass says in his testimony:
“Mr. Ward wanted us to meet Mr. Rupp so that he could show him our faces, I presume. * * * What he told us was this. Mir. Ward in here asked us to meet Mr. Rupp; he was in Mr. Haekenyos’ office. I don’t remember what was stated, only, as near as I can remember, he’ told Mr. Rupp that he had brought us to show us the timber; that he was negotiating with us to sell us the timber; that he wanted some extensions of time to make up his connection for carrying out the contract that he had with the Jessica Lumber Company. That is about the substance of the object; that he wanted to show Mr. Rupp who we were.”
Mr. Rupp appears to have granted an extension of time to September 5th, but, the contract with the Jessica Lumber Company having fallen through, in the meanwhile, plaintiff was unable to enter into the contract with Mr. Rupp on that day, and it, too, fell through, and, on September 17th, Mr. Rupp wrote to plaintiff from his home in Michigan, saying:
“While I was in Alexandria, and before I left the city, on August 27, last, I gave you until September 5, 1912, to close up the deal for our timber lands in Rapides parish, Louisiana, and, not hearing from you on that date, or since, I take it for granted that you did not succeed in bringing the matter to a close, as you had hoped. I am sure I gave you every opportunity to bring it to a close and myself and associates feel that we are no longer under any obligations to you, and we hereby give you due notice that all negotiations between us in connection with our Rapides parish lands are at an end, and we will sell to the first party that is acceptable to us and prepared to meet our price and terms.”
Plaintiff answered, on September 23d, that he would have been ready to go on, under the agreement with Rupp, if he had not been disappointed in his arrangements about the railroad that he was to build for the Jessica Company. “If I had gone on,” he says, “and arranged to build my own railroad, I would own yoiur timber now.” He further says:
“Mr. Lawless [representing the lumber company that he expected to build the road] is going ahead, and, in 30 days, I can close the contract with him, or, if I had until November 1, 1912, I could perfect my arrangements to build a railroad.”
It is shown that Mr. Lawless was not going on, and did not go on, at that time, and, moreover, that plaintiff was unable to give the bonds required by his contract with the Jessica Company and to comply with other obligations.
Some weeks later, Messrs. Gingrass and Seiss and their attorney and the legal adviser, in Alexandria, of Mr. Rupp concluded that it would be a good venture to buy the lands in question, and, after some correspondence on the subject, Messrs. Seiss and Hackenyos, on or about October 8th, went to Michigan, and, in a personal interview with Mr. Rupp and his associates, bought the land for the Bayou Rapides Lumber Company, a corporation which they had organized on the date mentioned, for something over $238,000, or $5 an acre more than the price agreed on between Mr. Rupp and the plaintiff.
The capital of the company was fixed at $75,000, of which" $66,000 appears to have been paid in, and, of the $66,000, $60,000 was paid in cash to Mr. Rupp. Seiss and Gin-grass took $20,000 of the stock, and the other $46,000 was taken by other persons. Plaintiff had no connection with the matter whatever.
Plaintiff, therefore, not only was not “the sole and only procuring cause” of the sale upon which he here claims a commission, but his relatioii thereto was too remote to be seriously considered in that connection. The *1030 most that can be said is that he may have put the idea of buying the land into the heads of Seiss and Gingrass, but if he did, it was not as the agent of defendants, but as the prospective buyer and seller, for his own profit, which profit, if he had been defendants’ agent, would have belonged to them. Moreover, Seiss and Gingrass did not eventually buy the land; they became mere minority stockholders in a corporation which bought it, and it was not sold upon the terms upon which defendants offered it to plaintiff, but for nearly $80,000 more.
It seems clear to us that a^ person who negotiates for the purchase of land, for his own account, with a view of selling it at a profit which is to inure to his benefit, has no claim upon the owner of the land as for services rendered to him, and that he does not acquire such claim when, his plan proving unsuccessful, the owner subsequently sells the land to a corporation in which such persons prospective buyers are mere minority stockholders.
The judgment appealed from is therefore affirmed.